13513

CAROLINA GROCERY CO. v. THE MORRIS CO. *ET AL.*

(166 S. E., 601)

*Messrs. C. G. Barr* and *R. E. Whiting,* for appellant,

*Messrs. A. C. Hinds* and *M. W. Pyatt*, for respondents,

November 16, 1932.

The opinion of the Court was delivered by MR. JUSTICE CARTER.

This action, commenced in the Court of Common Pleas for Georgetown County, April 5, 1930, arose out of the alleged failure of the defendants to comply with the terms and conditions of a certain lease of real estate, under which lease an ice plant of the plaintiff in the City of Georgetown, said State of South Carolina, was, on the 20th day of November, 1924, leased by the plaintiff unto C. C. Morris, James W. Carmalt, and D. B. Morris, co-defendants, doing business under the firm name The Morris Company, in the said City of Georgetown, which company was later, August 10, 1926, duly incorporated under the laws of South Carolina, under the name, The Morris Company, and the plaintiff alleges, in effect, that The Morris Company, as such corporation, by reason of an assignment of the said lease to the said corporation, became jointly obligated with

the said C. C. Morris, James W. Carmalt and D. B. Morris
to comply with the conditions of the said lease, as lessees
thereunder. The said C. C. Morris died before the com-
mencement of this action, and it is alleged by the plaintiff
that his estate had been fully administered and the adminis-
trator discharged before the commencement of this action.
In the record, we find a statement to the effect that the said
James W. Carmalt is a non-resident and he has not been
brought into the suit. However, the said D. B. Morris is
sued as a co-defendant in the action. Under the terms of
said lease it was agreed between the parties that the lessees
should be let into possession of the said premises, together
with the ice plant thereon, on the 1st day of January, 1925,
and should hold and enjoy the same for a period of five
years thereafter; and for the use and enjoyment of the said
premises, and the ice plant thereon, the lessees should pay
unto the lessor, as a rental therefor, the sum of $2,000.00
per year, $1,000.00 to be paid on the 1st day of January,
1925, and a like sum on the 1st day of July and January,
respectively, of each and every year during the continuance
of the lease. It was further agreed, under the provisions
of said lease, that the lease of said premises should include
all of the machinery and the fixtures on the premises, to-
gether with all appliances used in the manufacture of ice;
and it was further agreed by and between the parties to the
said lease that the terms first party (lessor) and second
party (lessee) should include the successors, executors, ad-
ministrators, and assigns and survivor or survivors of the
second parties wherever the context so requires or admits;
and it was further stipulated in the said lease that in the
event the second parties should sublease the said premises,
or any part thereof, such sublease or subleases should in
no means release the second parties from their obligation
to pay rent for the entire premises according to the terms
of the lease. Another pertinent provision of the lease was
to the effect that the second parties to the same agreed to

keep the machinery and fixtures on the said premises in as good condition as they were at the time they were let into possession of the same, "reasonable depreciation, wear and tear and loss by fire or act of God alone excepted."

The lessees went into possession of the said premises and ice plant January 1, 1925, and remained in possession of the same for the full term of said lease and made every payment, required under the terms of the lease. However, it appears that the lessees did not use the said ice plant any time during the period of the lease, except for a short time upon going into possession. In this connection the lessor, plaintiff herein, alleges that the lessees, defendants herein, did not vacate the said premises at the expiration of the said lease, January 1, 1930, but remained in possession and were in possession at the time of the commencement of this action, April 5, 1930.

The plaintiff set up three causes of action in its complaint. Under the first cause of action the plaintiff asks for reasonable amount of rent for the leased premises after the expiration of the lease agreement on the 31st day of December, 1929, and further alleged that the rate of $2,000.00 per year would be a reasonable rent to be paid to it for such withholding of possession. Under the second cause of action the plaintiff asked for damages in the sum of $12,000.00 for the failure of the defendants to keep the machinery and fixtures in question and turn same over to the plaintiff, in as good condition as they were at the time the lessees went into possession of the same, "reasonable depreciation, wear and tear and loss by fire or act of God alone excepted," and alleged under the second cause of action the specific acts and failures on the part of the defendants which brought about the damage according to the plaintiff's contention. Before the trial of the case the third cause of action was abandoned and there is no need, therefore, to refer to the same. Issues being joined the case was tried in said Court (the record does not disclose the date of trial) before Cir-

cuit Judge Hon. H. F. Rice, and a jury, resulting in a verdict for the defendants. Thereafter, the Circuit Judge having refused plaintiff's motion for a new trial, from judgment entered on the verdict, the plaintiff has appealed to this Court.

We find in appellant's brief the following statement with reference to the first cause of action: "Appellant does not contend in this appeal for any rights based on the first cause of action." Therefore, in this appeal we are concerned only with the errors imputed to the trial Judge with reference to the second cause of action.

Counsel for appellant state that there are three questions presented in the appeal for the Court's determination. We shall consider these in the order presented: "First. Did his Honor err in telling the jury that they could offset the amount accepted by respondents in settlement of their counterclaim against the amount offered by respondent in settlement of damages but refused by appellant?"

In its answer, the defendant, The Morris Company, set up a counterclaim against the plaintiff in the sum of $159.34, upon an account for ice sold and delivered by the defendant, The Morris Company, to the plaintiff at its place of business in the City of Georgetown, said county and state, between the 1st day of January, 1929, and the 30th day of April, 1930, and ask for judgment against the plaintiff for that sum. During the trial of the case the defendants admitted that there were certain small pieces of machinery removed from the said ice plant for which the defendants were liable, and they stated, by their counsel, during the trial of the case, that they were willing to pay for the same, contending that in no event could they be held for more than $90.00 for the same. In this connection, during the trial of the case, the following occurred in the Court:

*   *   *   *   *   *

"Mr. Hinds (of counsel for defendants). The only remaining part of the defendant's case is the proof of ac-

counts alleged to be $159.00, and I understand that plaintiff, through Mr. Barr, has an offer to make in that connection.

"Mr. Barr (of counsel for plaintiff). We admit owing the sum of $80.00 and tender that amount into Court.

"Mr. Hinds. We are willing, in order to avoid proof of the accounts, to accept that offer. And I think Mr. Woodward testified that the tools that were taken to the other place were reasonably worth $90.00, and we offer into Court —we accept the $80.00, and we offer into Court $10.00 so that the ice bills will offset the tools. The $90.00 consists of two motors and some tools. I think the testimony is they were worth $20.00, and I think Mr. Woodward said $40.00, and we are making it the highest amount so there cannot be any question.

"Mr. Barr: The testimony of the plaintiff was that it was $100.00, and we think that is a matter of element of damages, and therefore, we decline that offer.

" 'Thereupon Capers G. Barr, Esq., one of the attorneys for plaintiff, delivered to A. C. Hinds, Esq., one of the attorneys for the defendant, a check drawn on a Georgetown bank for the sum of Eighty ($80.00) Dollars, payable to A. C. Hinds, attorney, and signed by the proper officers of plaintiff's corporation. The said A. C. Hinds, attorney, thereupon indorsed said check to plaintiff and delivered the same together with Ten ($10.00) Dollars in cash, to the Clerk of Court. The Clerk of Court retains possession of the said check and Ten ($10.00) Dollars.' "

"Mr. Hinds: We make the offer, and we are going to hand the $10.00 to the clerk."

It is thus seen that the defendants, speaking through their counsel, Mr. Hinds, admitted that the tools referred to were worth the sum of $90.00, while, on the other hand, the plaintiff, through its counsel, Mr. Barr, contended that the said tools were worth $100.00. If the plaintiff was right in its position on this, the value of the tools removed, then

it was entitled to receive $10.00 more on this issue, but if the defendants were right in their position, as to the value of the tools removed, the plaintiff was not entitled to receive any further sum on this issue. The accounts would balance. In his charge, in this connection, his Honor instructed the jury as follows:

"There are two small items here—one is for tools and part of the machinery moved out, which is admitted. It is admitted that certain pieces of machinery were taken out by Morris. He says they are worth only so much money, and it is claimed by Morris that Scurry (who appeared to be the owner and controller of the plaintiff corporation) owes him $80.00 for ice. Scurry says that is correct. Scurry doesn't admit that the amount which Morris says the tools are worth is the correct amount. If the tools are not worth over $80.00, then you can balance off the one against the other. I believe that you have admitted it is worth $90.00?

"Mr. Hinds: Yes, sir.

"The Court: If you think on these items one ought to be balanced off against the other, you have a right to do that and leave that out of your consideration."

Under this instruction we are satisfied that the jury fully understood the issue which arose out of the plaintiff's claim for tools removed and the defendants' claim on the ice account. It must be remembered that the defendants not only indorsed over to the plaintiff the said $80.00 check but placed in the hands of the Clerk of Court for the plaintiff $10.00 in addition to the check, making up the $90.00. The jury evidently reached the conclusion under the evidence in the case that the tools removed were worth only $90.00, and, therefore, considered the accounts balanced. Furthermore, if the trial Judge misstated the issue it was the duty of counsel to call his Honor's attention to the same. This was not done, although full opportunity was given counsel to do so. In stating the issues, at the outset of his Honor's charge, his Honor stated: "Now, gentlemen, on both sides, if I

make any statement of fact that is incorrect, I want you to immediately correct me, because it will be inadvertent." Again, at the conclusion of his charge, the trial Judge asked counsel, "Is there anything further either side would like for me to charge?" and attorneys for both parties answered "nothing further."

The exceptions raising this question must be overruled.

The second question involved in the appeal, according to the contention of the appellant, is as follows: "In view of the issues in this action, did the action of his Honor in charging respondents' 15th and 16th requests to charge amount to a charge upon the facts?"

The 15th and 16th requests of the defendants, which his Honor charged, and which the appellant complains of, read as follows:

"15. It is the duty of one who claims to be injured by the breach of contract to reasonably exert himself to lessen the damages resulting therefrom; and cannot recover damage that may have been avoided by the exercise of reasonable effort, care and prudence.

"16. Equitable estoppel is defined as the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights, which might perhaps have otherwise existed, either of property, of contract, or of remedy as against another person who in good faith relied upon such conduct, and has been led thereby to change his position for the worse and who on his part acquires some corresponding right either of contract or remedy. This estoppel arises when one by his acts, representations, or admissions, or by his silence where he ought to speak out intentionally or by culpable negligence induces another to believe certain facts to exist and such other rightfully relies and acts on such belief, so that he will be prejudiced, if the former is permitted to deny existence of such facts."

As we understand the position of appellant, it is not contended that the requests embody an unsound principle, but it is contended that such charge was not applicable to the issues involved in the case at bar and that the same amounted to a charge on the facts and was prejudicial to the plaintiff's rights. At the beginning of the trial of the case the plaintiff, by its counsel, stated its position to the Court by reading the following from 16 R. C. L., 790: "The weight of authority undoubtedly is in favor of the doctrine that no action lies for a breach of a covenant to leave in good condition or the like until the expiration of the tenancy. The reason for this rule is apparent, for though the tenant, during the term, suffers the premises to become in a bad condition, he has during the term a *locus poenitentiae* to put the premises in the required condition, and it cannot be said, because of their condition at any time during the term, that they will not be left in a proper condition at the end of the term. * * * Notice to repair is unnecessary to the lessor's right to maintain an action for breach of the covenant to leave in repair."

With reference to the plaintiff's position the trial Judge at that time made the following ruling: "At any time during the period which he had a right of possession, it wouldn't make any difference what the condition of the premises were, it wouldn't make any difference whether or not plaintiff had notice of that condition, they had no right to step in and tell them to put it in condition, and they would not be estopped during the period the lease arose."

This position of counsel for plaintiff was also embodied in a request to charge and the same was so charged. So it clearly appears that the appellant has no ground for complaint in this respect but the appellant contends that the principle embodied in the defendants' 15th and 16th requests was not applicable and that by charging the same the appellant was prejudiced. We are unable to agree with this position.

Except for a few days immediately following the date the defendants went into possession of the said lot of land in question the ice plant leased to the defendants, as aforesaid, was not used by the defendants. It appears from the record that at the time the lease contract was entered into the defendants owned another plant in the said City of Georgetown and also operated a plant at Andrews, only a few miles distant. It was the contention of the defendants during the trial, in accordance with the allegations contained in their answer, that the ice plant so leased to the defendants in connection with the machinery and fixtures, connected therewith, was installed about the year 1903 and that the same was continually in use from that time to the time the defendants went into possession of the same and that during that long period of time little or no repair work was done on the same; that upon taking possession of the said plant under their lease it became apparent to the defendants that the machinery and fixtures "were so obsolete, worn and out of order as to render it impossible to operate the same without loss; that within a short time thereafter the operation of said ice plant was discontinued," for the reason that it could not be operated without a loss, due to the condition of the plant when the defendants came into possession of the same. Further pertinent allegations to the question involved, contained in defendants' answer, were the following:

"III. That at the time of the discontinuance of said operations and continuously since, plaintiff was and has been in the active operation of its business and had its principal office on premises immediately adjacent and contiguous to the leased premises upon which said machinery and fixtures were located, the leased premises and the premises occupied by plaintiff, prior to said lease, constituting one lot; that at the time of the said discontinuance of said operation of said plant and continuously since, the officers, representatives, agents or employees of plaintiff were daily, on each working

day during the entire term of said lease, on adjacent and contiguous premises and saw, observed and knew that the said ice plant was not being operated; that at no time during the period mentioned in said lease did any officer, representative, agent or employee of plaintiff complain to defendants or any of them or any officer, representative, agent or employee of the corporate defendant, on account of such discontinuance of said operation of said ice plant or suggest that the same should be operated; that plaintiff's silence, inactivity and acquiescence in and apparent approval of the cessation of the operation of said plant in the face of its daily observation and knowledge thereof induced the lessees and their successors in interest to prolong and extend such cessation throughout the whole period of such lease and caused them to assume and infer that plaintiff did not and could not claim or contend that under said lease agreement the said ice plant was required to be operated and to rely and to act upon such assumption and inference.

"IV. That in strict compliance with terms of said lease agreement, both as to amount and time of payments, defendants did pay over and deliver in full to plaintiff each and every installment of rent for said premises during the whole term for which it was rented, which said rent was received and accepted by plaintiff and that the plaintiff thereby received and accepted the full benefits of said lease agreement for and during the whole term thereof without any suggestion or intimation that the defendants were not satisfactorily performing their part of the contract, thereby leading defendants to believe that they were faithfully and fully discharging all their obligations under said lease agreement and to act upon such belief.

"V. That on or about January, 1927, plaintiff rented and leased a large portion of said ice plant from defendants and thereupon altered the same and installed thereon a cold storage plant; that such alterations and the installation of said cold storage would have prevented the operation of said

ice plant; that from the time last mentioned to the end of the lease period of the original lease agreement, plaintiff continuously used and occupied said portion of said ice plant and had access to all parts of the ice plant and defendants are informed and believe that thereafter and until the termination of said original lease plaintiff through its officers, representatives, agents or employees could and did daily observe and take notice of the said machinery and fixtures and the condition of the same, but at no time during the term of said original lease agreement did the plaintiff or any of its officers, representatives, agents or employees complain to defendants or any of them about the condition of said machinery and fixtures or intimate that there was any want of due care with respect thereto on the part of the defendants or any of them; that it was the duty of the plaintiff to reasonably exert itself to minimize any damages which it might sustain by reason of any failure of the defendants to use due care with respect to said machinery and fixtures; that the silence, inactivity and acquiescence in and apparent approval of the condition of said machinery and fixtures and the care used by defendants with respect thereto in the face of plaintiff's daily observation and notice and its duty to minimize its damages induced the defendants to continue the use of the care employed by them and led them to believe that they were using all the care required of them by the contract and under the circumstances and to act upon such belief.

"VI. That by reason of all of the foregoing facts the plaintiff is now estopped from claiming that defendants were obligated to continue the operation of said ice plant or contending that defendants failed to use due care with respect to said machinery and fixtures and is also estopped from maintaining this action against the defendants or any of them."

The defendants also made the following further allegation, which has a bearing on the question under considera-

tion: "That plaintiff, at the termination of the lease agreement mentioned and referred to in the complaint, was in possession of a large portion of the leased premises and had access to all parts of the same and could have taken possession of the whole thereof without any resistance from the defendants or any of them; that promptly after the termination of the lease agreement, defendants, being ready, willing and desiring to surrender up and deliver possession of the leased premises to plaintiff, did, through D. B. Morris, offer to formally deliver the same, but plaintiff, through its president and manager, J. J. Scurry, indicated its preference to dispense with the formality."

The stating of these defenses, set forth in the above allegations, in detail, constituted full notice to the plaintiff that it was the purpose of the defendants to rely upon these alleged facts, and if, in the opinion of the plaintiff, such allegations did not constitute a proper defense to the plaintiff's alleged facts, as set forth in its complaint, then it was the duty of plaintiff to ask the Court to strike such allegations from the defendants' answer, but no motion was made on behalf of the plaintiff for such purpose. We may add, however, that in our opinion the allegations, as set forth in the defendants' answer, constituted a proper defense, and a motion to strike out would have been of no avail to the plaintiff. In this connection, we call attention to the opinion of this Court in the following cases: *Burkhalter v. Townsend,* 139 S. C., 324, 325, 138 S. E., 34, and *National Bank of South Carolina v. People's Grocery Company,* 153 S. C., 118, 150 S. E., 478. It would serve no useful purpose to review herein the testimony in the case as a whole, but, after a careful study of the testimony in the entire case, we deem it sufficient to state that there was testimony tending to establish the defenses set forth in the defendants' answer. However, we will call attention to some of the testimony bearing on the condition of the plant which developed soon after the defendants got possession of the same and also

as to the opportunity the plaintiff had to ascertain knowledge concerning the plant's condition and the attitude of the plaintiff from which the inference may be drawn that the defendants were not expected by the plaintiff to operate the plant or to keep the same up.

In this connection Mr. D. B. Morris, one of the defendants, testified to the effect that he saw the plant before entering into the said lease; that he saw the plant while it was in operation, and, also, once when it was not in operation; that while the lease was entered into November 20, 1924, the defendants, under the terms of the lease, were not given possession of the plant until January 1, 1925, and did not operate the same until after getting in possession. As to the condition of the plant, after taking the same over, Mr. Morris further testified as follows:

"Q. After the first of January when you undertook to take the plant over, what examination did you make at that time of the machinery, and what did you find? A. We examined it for a period of three or four days. The first day Mr. Woodward went down there and I went down myself. I didn't spend all day there, went back and forth to the other plant. He called my attention to various things, and we went into them gradually and found out those defects.

"Q. Did Mr. Woodward correctly describe the defects discovered? A. He found a good many defects, and I found some myself. The second or third day we turned the plant over—I had an engineer in Andrews by the name of Satter, who was an expert steam man, and when he came down we looked over the boilers and the engine, and at that time we decided it could not be operated at a profit in the condition the boilers were in—he didn't want to keep steam on them. As far as putting steam through the engine to make ice, he said it was—

"Mr. Barr. I object to any conversation.

"Q. You had this expert to make his examination, and he gave you his report, and as a result of his report, what did

you do or not do? A. I shut the plant down as rapidly as I could."

As to what the defendants did by way of taking care of the plant. Mr. Morris further testified

"Q. After you shut the plant down, what did you do towards looking after the machinery? A. I instructed Mr. Woodward to go down there every thirty days and turn the machinery over, which he did, the pumps.

"Q. What do you mean by turn it over? Fire it up? A. No, sir; revolve it by hand, put grease in the cylinders and grease on the bright parts on the outside of the engine, grease on the pistons and pumps and so forth. Every thirty days he would go down and turn the pumps over and the compressor and the engine.

"Q. According to my recollection of the testimony of Mr. Adams and Mr. Miller, the only other thing that could be done was to put cans in the brine tank and keep brine on them. Why didn't you do that? A. We couldn't keep water or brine in the brine tank.

"Q. Why? A. It wouldn't stay in on account of the leaks.

"Q. Do you know of anything that was reasonable to be done other than what you did do? A. No, sir.

"Q. Before shutting the plant down, did you make an honest effort to determine whether or not it could be run profitably? A. Yes, an honest effort. We figured on the amount of coal it would take, and the amount of ice we figured we couldn't get out of it. I knew it couldn't be done."

Notwithstanding the defendant could not operate the plant they made all payments promptly, according to the terms of the lease, and it is not contended that there was any sum owing the plaintiff as rent for the plant for the entire period of the written lease.

As to plaintiff's knowledge concerning the condition of the plant during the term of the said lease, and as to plaintiff's conduct in the matter and leading the defendants to

believe it was not the intention of the plaintiff to require defendants to operate the plant or to exercise any greater care of the plant than the defendants were exercising, we call attention to the following testimony of Mr. Morris:

"Q. This letter he introduced in evidence, he seemed to be very thankful to receive it—was that his general attitude when paying time came? A. Yes, sir.

"Q. Other than what it contained in that letter, did Mr. Scurry or any representative of the Carolina Grocery Company make any complaint to you of any kind? A. No, sir; never.

"Q. Did he or any agent of the plaintiff ever at any time make any suggestion as to what you should do under the circumstances? A. No, sir.

"Q. Mr. Scurry's office was on the adjoining premises to this machinery and premises rented to you? A. Yes, sir.

"Q. Do you know of anything that could have prevented in any wise Mr. Scurry from day to day throughout the entire five years from seeing the machinery and observing its condition? A. Nothing whatever.

"Q. With respect to re-renting part of the property to him, will you describe to the jury what part of the property that was? A. Yes, sir."

There was testimony introduced on the part of the plaintiff to the effect that there were locks on the doors of said plant which prevented the plaintiff's representatives from inspecting the plant; but the testimony introduced on behalf of the defendants tends to show that there were no locks on the plant which prevented the plaintiff at any time during the term of said lease, from entering and inspecting any part of the plant.

There was also testimony introduced on the part of the defendants to the effect that the plaintiff re-rented from the defendants a portion of the lot covered by the said lease, which included a portion of the plant on said lot, the part which was known as the room for storing the ice as it was

"pulled" and which was absolutely essential in the operation of the said plant. There was also testimony tending to show that Mr. Scurry, acting for the plaintiff, borrowed from the said ice plant, with the consent of Mr. Morris, a pump, which Mr. Scurry used in the operation of another plant which he, Mr. Scurry, was at that time installing. There was also testimony to the effect that Mr. Scurry, during the term of said lease, sold to the defendants coils which were used in the storage room of the said ice plant, to be used in another plant of the defendants, and that without said coils the said ice plant covered by the lease could not be operated successfully. It further appears from the testimony offered on the part of the defendants that the storage room, included with the premises re-rented to the plaintiff, formed an essential part of the said ice plant, and that the said plant could not be operated successfully without the said storage room. The testimony offered by the plaintiff is in conflict with that of the defendants in a number of respects, which made an issue for the jury. If the testimony introduced by the defendants is to be believed, and that was a question for the jury, it may be reasonably inferred that, during the term of the lease, the plaintiff took a part in dismantling the said plant in question, and, by plaintiff's conduct, led the defendants to believe that the plaintiff did not expect the defendants to operate the plant or exercise any greater care in the protection of the same.

In our opinion, the law of estoppel was properly pleaded and the trial Judge committed no error in charging the defendants' requests in question.

The last question to which the appellant calls the Court's attention is the following: "Third. Was the charge of his Honor inconsistent, confusing to the jury, and prejudicial to appellant's rights, in first charging appellant's 8th request and then charging, at the request of the respondents, the duty of one injured by breach of contract to minimize damages and the doctrine of equitable estoppel?"

Appellant's eighth request, referred to above, which the trial Judge charged, contained a statement of the law as laid down in 16 R. C. L., 790, and which appellant's counsel read to the Court at the beginning of the trial. It is conceded that this statement of the law is correct, but it does not follow that the trial Judge erred in charging the law relative to the duty of one to try to minimize his damages under the facts of this case. The exceptions charging this error are overruled for the reasons stated in our consideration herein of the second question.

In our opinion, the Circuit Judge committed no error and the plaintiff got a fair trial. The exceptions are, therefore, overruled, and it is the judgment of this Court that the judgment of the Circuit Court be, and is hereby, affirmed.

MR. CHIEF JUSTICE BLEASE and MESSRS. JUSTICES STABLER and BONHAM, and MR. ACTING ASSOCIATE JUSTICE W. C. COTHRAN concur in result.